**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Matthew J. MOSCHETTA and Edward
M. Spieler, Defendants-Appellees.**

**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Matthew J. MOSCHETTA, Edward M.
Spieler and Gerald Deutsch,
Defendants-Appellees.**

Nos. 80–5270, 80–5475.

United States Court of Appeals,
Fifth Circuit.
Unit B

June 1, 1981.

Martin R. Raskin, Sp. Atty., U. S. Dept. of Justice, Miami, Fla., Theodore G. Gilinsky, U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Neal R. Sonnett, Miami, Fla., for Matthew Moschetta.

Steadman S. Stahl, Jr., Joseph A. Varon, Hollywood, Fla., for Edward Spieler.

Joseph S. Paglino, Miami, Fla., for Gerald Deutsch.

Before DYER, TJOFLAT and FAY, Circuit Judges.

FAY, Circuit Judge:

Appellant, the United States of America, seeks reversal of the District Court's affirmation of the Magistrate's report and recommendation for the suppression of evidence seized by agents of the Bureau of Alcohol, Tobacco and Firearms from appellee's, Edward Spieler, automobile. Finding that the warrantless search of the trunk of the automobile was proper, that exigent circumstances justified the warrantless search of a briefcase in that trunk, but that the Supreme Court of the United States ruling in *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) requires the police to obtain a warrant before searching any closed opaque container (in this instance a brown paper bag) whose exterior or shape does not disclose its probable contents, we affirm in part and reverse in part the District Court's action.

## I.

In November, 1978 Gregorio Suarez, upon referral by the Hialeah Police Department, Hialeah, Florida, contacted Bureau of Alcohol, Tobacco and Firearms' (ATF) agents Wilhjelm and Brady in regards to the distribution of illegal silencers and weapons in South Florida. Suarez stated that he had been approached by Gerald Deutsch, a man under Suarez's supervision at his place of employment, who stated that such contraband was for sale if Suarez was interested. ATF agents instructed Suarez to pursue the offer.[1]

As a result Suarez went with Deutsch to Calamity Jane's Gunshop where he met Matthew Moschetta. Suarez related to the agents that when silencers were discussed Moschetta said that his man "Ed" made the best and that he could supply one attached to an automatic pistol for $1,000.00. Suarez also related to agents that Deutsch indicated that "Ed" and Moschetta were ex-partners in the gun business, that "Ed" had quoted to Deutsch a lower price but since he no longer had "Ed's" phone number they had to deal through Moschetta.

Subsequently on December 9, 1978 Moschetta delivered to Suarez one silencer with attached .22 automatic in a brown paper bag for $1,000.00. ATF investigation and surveillance continued. On December 19, 1978 Suarez telephoned Moschetta and asked when a second silencer would be ready and Moschetta stated, "just a moment, my man Ed is here at this time, I'll ask him." *Record, Suppression Hearing* at 24. Surveillance of the Calamity Jane Gunshop indicated that Edward Spieler had entered the shop while Moschetta was there on the afternoon of the call. No one else had been observed on the premises during that visit, although the agent testifying at

the suppression hearing indicated that he did not know whether there was also a back door to the shop. At any rate, on December 20, 1978 Moschetta delivered a .22 automatic pistol with a silencer attached to Suarez in return for $1,000.00.

On January 13, 1979 Suarez and Moschetta again met at the gunshop and Moschetta said that he had a "friend" who could make an assassination kit.[2] In response to this offer on February 20, 1979 Suarez, accompanied by undercover agent Volaska, met Moschetta and ordered an assassination kit as well as an AR7 rifle with attached silencer.[3] Two days later they delivered to Moschetta a dark gray Samsonite briefcase to be used in the construction of an assassination kit. The briefcase was an ordinary business model and without any exterior distinguishing marks. The only identifying mark placed on it was on the inside hinge. This was visible only under close observation with the briefcase opened.

On Saturday, February 24, 1979, Suarez told agent Wilhjelm that Moschetta had called and indicated that Suarez could expect delivery of the silencers that evening. Pursuant to this information agent Wilhjelm began surveillance of Spieler. He set up constant surveillance of the machine shop and Spieler's car after he noticed that the car had been moved from Spieler's home to the shop. At approximately 4:15 p.m. the surveilling agents saw Spieler leaving the building carrying a brown paper bag and a dark gray briefcase. He placed these items in the trunk of his automobile, went back into the building, returned shortly thereafter and got into the car. The agents testified that at that point they believed Spieler was carrying the assassination kit briefcase which had been provided to Moschetta.

---

**1.** ATF agent Wilhjelm had received information in September of the same year from a reliable confidential informant that an Edward Spieler was manufacturing 70 percent of the quality silencers in the South Florida area and that Spieler worked in a machine shop and that probably his employer did not know since Spieler was probably doing it after hours or on weekends. *Record, Suppression Hearing* at 9–12, 38–42.

**2.** An assassination kit is an automatic pistol with attached silencer inside a briefcase with a spring triggering device for firing the weapon without opening the briefcase.

**3.** An AR7 rifle is a .22 caliber rifle which is capable of being broken down with the trigger assembly and barrel placed in the stock becoming a portable weapon in a small package.

As Spieler began to back the car up, the agents blocked his path with one of their vehicles. Then with drawn guns they approached his car and ordered Spieler from his vehicle. At that point agent Wilhjelm took the keys from the ignition and without Spieler's consent, opened the locked trunk of the vehicle. Inside he saw an ammunition box, a gray briefcase, a number of paper bags and miscellaneous items including what appeared to be the stock of an AR–7 rifle. He then "opened up the brown paper bag, the first one that was right next to [him] and . . . found three metal devices that were silencers. . . ." *Record, Suppression Hearing* at 31. With this discovery, agent Wilhjelm temporarily halted his search and advised Spieler that he was under arrest and that his vehicle would be seized.[4]

Thereafter, agent Wilhjelm opened the briefcase. As to his motives he testified that:

> . . . I opened up the briefcase because I thought it contained—it was the Government briefcase, that it did contain an assassination kit which would include a loaded weapon with a triggering device and I wanted to make it secure, plus to ascertain for sure that it was the one.

*Record, Suppression Hearing* at 20. He further stated that such actions were consistent with procedure.[5] However, the briefcase did not contain the assassination kit but rather loaded handguns, personal effects and the barrel for the AR7 that had been threaded.

The agents did not attempt to secure an arrest or search warrant during either the surveillance or the stop and search of Spieler's automobile. Accordingly, after a hearing, the Magistrate recommended to the District Court that appellee's motion to suppress all evidence seized from the trunk be granted despite the fact that probable cause

existed for a warrant had it been sought. The Magistrate also ruled that appellee, Moschetta had automatic standing under *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) and *United States v. Reyes*, 595 F.2d 275 (5th Cir. 1979). The District Court affirmed both recommendations. The United States appeals both decisions.

## II.

At principal issue is the application of *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) and *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) to the search of containers found in appellee's trunk. These decisions, and specifically *Sanders*, established that, absent exigent circumstances, the police are required to obtain a search warrant before opening and searching any type of luggage, locked or unlocked, taken from an automobile which has been properly stopped and searched, without a warrant but on probable cause, for contraband. As stated by Judge Ginsburg in *United States v. Ross*, No. 79–1624 (D.C.Cir. March 31, 1981) (*en banc*), a case involving a similar stop and search for contraband, "[t]he case before us raises the question whether *Sanders* establishes only a 'luggage rule' or whether the reasoning of that decision extends as well to other containers used to carry personal belongings and effects, containers smaller, less solid, or less durable than those on sale in a luggage shop." Slip op. at 2. We conclude, in line with *Ross*, that *Sanders* does not establish a "luggage rule" or by implication an "unworthy container" exception, but that it requires the police to obtain a warrant before searching any closed opaque container whose exterior or shape does not disclose its probable con-

---

**4.** During agent Wilhjelm's initial search of the trunk, the agents holding Spieler conducted a frisk and found a loaded .38 pistol in Spieler's left boot.

**5.** Q  Is [an assassination kit] something that you would normally transport unopened?

A  No, sir. Anything that contains a weapon, and especially one that's in a briefcase like that that's hooked up by springs and so forth, I would examine it first and make sure that it was unloaded before I transported it.

*Record, Suppression Hearing* at 33.

tents. *United States v. Ross,* slip op. at 1, (Wilkey, J. dissenting on other grounds). *See* 422 U.S. at 764–65, n.13, 99 S.Ct. at 2593–2594.

In *Sanders* police officers acting on an informant's tip placed the Little Rock, Arkansas Airport under surveillance specifically for the defendant and a green suitcase allegedly containing marijuana. As predicted Sanders appeared and after retrieving a green suitcase from the airlines baggage claim he gave it to a companion who placed it in a waiting taxi's trunk. When the taxi drove away carrying the suitcase and the companions the police pursued and stopped it. At the request of the police, the taxi driver opened the trunk and without asking permission the police opened the unlocked green suitcase and discovered 9.3 pounds of marijuana. Subsequent to this discovery the individuals were arrested.

■ The Supreme Court upheld the warrantless stop and search of the taxi's trunk for contraband based upon the long standing "automobile exception" to the warrant requirement. *See, e. g., United States v. Martinez-Fuertes,* 428 U.S. 543, 555, 561–62, 96 S.Ct. 3074, 3081, 3084, 49 L.Ed.2d 1116 (1976); *United States v. Ortiz,* 422 U.S. 891, 896, 95 S.Ct. 2585, 2588, 45 L.Ed.2d 623 (1975); *Chambers v. Maroney,* 399 U.S. 42, 49–50, 90 S.Ct. 1975, 1980, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). So, too, were agent Wilhjelm's actions proper in the present case. He had ample probable cause to believe that Spieler was carrying contraband in his car, specifically an assassination kit and silencers, based upon (1) Suarez's most recent communication, (2) Suarez's previous dealings with Moschetta, (3) the confidential informant's tip on Spieler and (4) the agents own observations of the suspect. Further, once lawfully in the trunk the police could properly seize and use at trial any articles in "plain view" within the trunk, i. e. the stock of the AR7 rifle. *See, e. g., United States v. Biswell,* 406 U.S. 311, 317, 92 S.Ct. 1593, 1597, 32 L.Ed.2d 87 (1972); *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 993,

19 L.Ed.2d 1067 (1968) (*per curiam*); *United States v. Brannon,* 616 F.2d 413, 416 (9th Cir. 1980), *cert. denied,* 447 U.S. 908, 100 S.Ct. 2993, 64 L.Ed.2d 858 (1981); *United States v. Newbourn,* 600 F.2d 452, 456 (4th Cir. 1979). Therefore, the District Court's suppression of this article of evidence must be reversed.

■ Turning to the seizure of appellee's briefcase it is clear that, absent exigent circumstances, *Sanders* would apply to a Samsonite briefcase as surely as it would to a small Samsonite suitcase. *See United States v. Sutton,* 636 F.2d 96, 100 (5th Cir. 1981). *See also, Sanders,* 442 U.S. at 764–65 n.13, 99 S.Ct. at 2593–2594; *Ross,* slip op. at 7 n.2 (Tamm, J., dissenting); *cf. United States v. Schleis,* 582 F.2d 1166, 1172 (8th Cir. 1978) (upon remand for reconsideration in light of *Chadwick*). However, in this instance we have testimony clearly setting out an exigent circumstance. Agent Wilhjelm stated his belief that the briefcase contained a dangerous instrumentality, i. e. a loaded spring triggered pistol. In light of this belief it would be indeed foolhardy, as this Court has previously noted, to delay a search of such containers. *See United States v. Johnson,* 588 F.2d 147, 151 n.5 (5th Cir. 1979). There is ample support for the validity of such a search and for the use of any evidence gained during such search at trial. *See Sanders,* 442 U.S. at 763–64 n.11, 99 S.Ct. at 2592–2593; *United States v. Chadwick,* 433 U.S. 1, 15 n.9, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977); *Cady v. Dombrowski,* 413 U.S. 443, 447–448, (1972); *Ross,* slip op. at 18; *United States v. Newbourn,* 600 F.2d 452, 456 (4th Cir. 1979). Therefore the District Court's suppression of evidence found in appellee's briefcase must also be reversed.

We reach the most difficult determination, the suppression of three silencers found by agent Wilhjelm in a closed brown paper bag. This path has most recently been trod by the United States Circuit Court for the District of Columbia, *en banc,* and the opinions expressed therein appear to be fairly all encompassing. In *United States v. Ross,* (D.C.Cir. March 31, 1981)

the Court faced a situation both on the law and the facts not meaningfully distinguishable from our own. Acting on a tip from a confidential informant that Ross was selling narcotics and that the contraband was in the trunk of his car, District of Columbia police sought, found and stopped Ross. They arrested him after a search inside the auto uncovered a pistol in the glove compartment. The police then took Ross's keys, opened and searched the car's trunk. They found in it side by side a closed but unsealed brown paper bag and a zippered 7″ × 8″ × 2″ red leather pouch. The police opened the bag and discovered thirty glassine envelopes later determined to contain heroin. Then they opened the pouch and discovered $3200 in currency. At no point had the officers sought a search warrant. The District Court denied the motion to suppress and a panel of the D. C. Circuit affirmed this decision in regard to the paper bag because it was closed but unsealed. However, it reversed, on the strength of *Sanders*, the decision as to the zippered pouch. *Ross,* slip op. at 3 n.3. Factually, absent exigent circumstances, this Court would also be faced with side by side containers in a trunk which could conceivably be distinguished as the panel did in *Ross.* In fact, the government urges us to make this distinction. Further, the government urges that our own precedent indicates that such a determination is possible.

In *United States v. Rigales,* 630 F.2d 364, 367–68 (5th Cir. 1980) this Court, applying *Sanders,* reversed a conviction, for receiving a pistol while a convicted felon, upon the warrantless search of a zippered leather case which contained a firearm. Judge Gee, writing for the Court, reasoned that since no evidence had been adduced which

indicated that the contents of the case could be inferred from its outward appearance, the owner's expectation of privacy in the contents should be accorded Fourth Amendment protection. *Id.* at 368.

On the other hand in *United States v. Sutton,* 636 F.2d 96 (5th Cir. 1981) this Court upheld the warrantless search of a paper sack which had on the exterior an inscription identifying it as coming from a particular pharmacy, which sack was found "lying with a corresponding indifference toward any expectation of privacy, in full view on the front floorboard" of an automobile lawfully stopped for contraband. *Id.* at 100. Unfortunately the opinion does not state that the sack, which held the specific items of controlled substances whose sale triggered the stop and search,[6] was closed or not. However the government's arguments notwithstanding, we conclude that the paper sack in *Sutton* is distinguishable from the paper bag before us on the grounds that the contents of that sack were in "plain view". *See* 636 F.2d at 99. Therefore, we find ourselves in precisely the same position as that faced by the en banc D. C. Circuit Court in *Ross* contemplating a closed paper bag alongside a clearly protected, absent exigent circumstances, more durable container.

Several of our sister courts have found that there is a lower expectation of privacy in various plastic and paper containers based upon an implication that *Sanders* can be limited to a rule applicable to only durable containers.[7] Yet, as pointed out by the *Ross* majority, most of these decisions relied at least in part upon the discredited reasoning of the *Ross* panel[8] which distinguished a leather pouch from a paper bag. Al-

---

**6.** Also it is noteworthy that evidence obtained in a warrantless search of a briefcase found in the trunk of the automobile was suppressed by the court under *Sanders.*

**7.** *See, e. g., United States v. Mannino,* 635 F.2d 110 (2d Cir. 1980) (plastic bag); *United States v. Mackey,* 626 F.2d 684 (9th Cir. 1980) (paper bag); *United States v. Blair,* 493 F.Supp. 398, 416 (D.Md.1980) (cardboard boxes). *Cf. United States v. Brown,* 635 F.2d 1207 (6th Cir. 1980); *United States v. Jimenez,* 626 F.2d 39, 41 (7th

Cir. 1980), *petition for cert. filed* (no expectation of privacy in paper bag on facts of this case, but facts in another case could show such an expectation), 49 U.S.L.W. 3429 (U.S. Nov. 20, 1980) (No. 80–817); *United States v. Goshorn,* 628 F.2d 697 (1st Cir. 1980) (remand for evidence whether defendant had expectation of privacy in paper bags).

**8.** Slip op. at 14, n.16.

though a difficult call, we refuse to create a blanket exception to the Fourth Amendment for paper bags but rather base our holding upon those principles established by the Supreme Court for containers in general.

First and foremost we do not find the government drawn "implications" in *Sanders* to be of much substance. The argument goes that the important characteristic of luggage in both *Chadwick* and *Sanders* is that "luggage is a common repository for one's personal effects and therefore is inevitably associated with the expectation of privacy." 442 U.S. at 762, 99 S.Ct. at 2591. The government argues that paper bags, and the like, are neither *common* repositories nor *inevitably* associated with expectations of privacy. But this is to make an absolute out of mere descriptors and to narrowly construe Fourth Amendment protections, rather than its exceptions. Such reasoning would place an entire body of law upon its head.

As pointed out in *Sanders* itself, the Court has declared only a few "jealously and carefully drawn", *Jones v. United States*, 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958), exceptions to the warrant requirement "where the societal costs . . . outweigh the reasons for prior recourse to a neutral magistrate." 442 U.S. at 759, 99 S.Ct. at 2592. *See United States v. United States District Court*, 407 U.S. 297, 318, 92 S.Ct. 2125, 2137, 32 L.Ed.2d 752 (1972). These few situations which necessarily impinge on the protective purposes of the Fourth Amendment "have been carefully delineated and the burden is on those seeking the exemption to show the need for it." 442 U.S. at 760, 99 S.Ct. at 2591, *quoting United States v. Jeffers*, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951).

Notwithstanding these clearly overriding principles, the government argues that *Sanders*, in footnote 13, provides for less protection of certain non-luggage type containers. We do not disagree with this conclusion as much as with the government's arguments as to the *nature* of these less protected containers. The footnote appears clear to us, it states:

> Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance. Similarly, in some cases the contents of a package will be open to "plain view," thereby obviating the need for a warrant. See *Harris v. United States*, 390 U.S. 234, 236 [88 S.Ct. 992, 993, 19 L.Ed.2d 1067] (1968) (*per curiam*). There will be difficulties in determining which parcels taken from an automobile require a warrant for their search and which do not. Our decision in this case means only that a warrant generally is required before personal luggage can be searched and that the extent to which the Fourth Amendment applies to containers and other parcels depends not at all upon whether they are seized from an automobile.

442 U.S. at 764–65, n.13, 99 S.Ct. at 2593.

This footnote does not articulate a distinction based upon durability or common usage [9] as much as one wherein the contents of the container are in "plain view" either directly or by the outward appearance of the container. Any other interpretation smacks of legerdemaining to avoid an unpleasant result due to the existence of the Exclusionary Rule.

Indeed, the administrative difficulties for the police engendered by the *Sanders* decision may give one pause to wonder whether

---

**9.** Certainly some people in our society do use paper sacks and the like for receptacles of personal effects, even if the majority do not. *See Ross* n.30; slip op. at 22 n.30 and slip op. at 1 (MacKinnon, J. dissenting). Any new expectation of privacy analysis which in effect circumvents the rationale of *Sanders, see Ross,* slip op. at 2–15 (Tamm, J. dissenting) necessarily implies the denigration of the privacy interests of such people. *See generally,* Hinson, *Warrantless Search of Automobiles, Exception Without Justification,* 32 Hastings L.J. 127 (1980).

our legal abstractions have outrun common sense. At present the court will allow police to stop and search an entire automobile for contraband without a warrant, but require the police to stop that search and obtain a warrant upon reaching any closed opaque container whose exterior or shape does not disclose its probable contents. To the policeman or citizen, untrained in legal principals, this might seem anomalous, yet for us to allow some but not all containers to be protected by distinguishing "felt, vinyl, canvas, tinfoil, cardboard, or paper containers from leather; sacks closed by folding a flap from those closed with zippers, drawstrings, buttons, snaps, velco fastenings, or strips of adhesive tape", *Ross,* slip op. at 21 would be to cause worse confusion.

 The Supreme Court has clearly declined to extend the *Carroll* and *Chambers* "automobile exception" to allow warrantless searches of everything found within an automobile. 442 U.S. at 762–63, 99 S.Ct. at 2591–92. The principles which provided for this decision, specifically the need for only jealously and carefully delineated exceptions to the warrant requirement, also mandate that the line drawn be a solid one and not one frittered away by esoteric distinctions. The brown paper bag involved here was closed, had no exterior markings, disclosed nothing by its shape, was not suspected of containing anything dangerous to those nearby and had no cracks, rips or tears.[10] Therefore the District Court's decision to suppress the evidence found in this brown paper bag under these circumstances is affirmed.

### III.

Finally, in regards to cross-appellant Moschetta's argument that he has standing to complain of the search and seizure of Spieler's effects, we conclude that the grant of automatic standing under *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4

L.Ed.2d 697 (1960) must be reversed. Under *United States v. Salvucci Jr.,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), Moschetta does not have recourse to the rule for automatic standing and we find that no rights of Moschetta were violated.[11] *See Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1969).

The decision of the District Court is AFFIRMED in part, REVERSED in part and REMANDED.

---

10. We note that we are not dealing with a situation wherein a law enforcement official lawfully picks up or carries a container and can clearly detect by feel the contents.

11. *See generally,* Williamson, *Fourth Amendment Standing and Expectations of Privacy: Rakas v. Illinois and New Directions For Some Old Concepts,* 31 *U.Fla.L.Rev.* 831 (1979).