UNITED STATES of America,
Plaintiff-Appellee,

v.

Peter KREIMES, Defendant-Appellant.

No. 80–5290.

United States Court of Appeals,
Fifth Circuit.
Unit B

July 9, 1981.

Ross Rosenberg, Miami, Fla., for defendant-appellant.

Donald E. Christopher, Asst. U.S. Atty., Orlando, Fla., for plaintiff-appellee.

Before HILL, FAY and HENDERSON, Circuit Judges.

FAY, Circuit Judge:

Appellant, Peter Kreimes, appeals his conviction, following jury verdicts of guilty, on charges of conspiracy to possess and possession of marijuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 846 and 18 U.S.C. § 2 (1976). Finding that the arresting officer had reasonable grounds for stopping the appellant and that exigent circumstances justified the warrantless search of appellant's luggage, we affirm the trial court's denial of appellant's motion to suppress all evidence so obtained. Finding, further, sufficient evidence for a jury verdict of guilty on the charge of conspiracy, we affirm appellant's conviction on all counts.

### I.

On June 26, 1979 at approximately 11:00 P.M. St. Lucie County Deputy Sheriff Mosley heard a low-flying multi-engine aircraft pass over his home five miles south of Fort Pierce, Florida and two miles from the Atlantic Ocean. The aircraft headed in a westerly direction and did not display navigational lights. Because he felt the plane might be involved in smuggling, Mosley broadcast this information over his police radio.

At approximately 11:30 P.M. Osceola County Deputy Sheriff Bavar received a communication from his radio dispatcher that a *BOLO* teletype had been received from the Fort Pierce Police Department regarding a northbound low-flying aircraft, without navigational lights, headed toward Osceola County. Deputy Bavar was, at this time, near Kenansville, Florida, an isolated southern Osceola County town. He stepped out of his patrol car and heard a large low-flying aircraft, without lights, heading north up Highway 441. The aircraft made a clockwise circle east of Kenansville and then continued its flight north, following Highway 441.

Deputy Bavar notified the Osceola County Sheriff's office of his observations and then proceeded north in his patrol car on Highway 441 at a high rate of speed. Seven miles north of Kenansville, Deputy Ba-

var stopped and exited his car. Once again, he heard the sound of a large aircraft to the north but then he heard the engines slow as if throttled back for a landing. Pursuant to procedures established by the Osceola County Sheriff's Department, the Orlando Flight Service had been contacted about these developments. They advised that radar contact had been lost with a plane approximately three miles southwest of Holopaw, Florida. This information was passed to Deputy Bavar who proceeded north on Highway 441 to a point a mile and a half south of Holopaw and a quarter of a mile south of a dirt road, known as the Charlie Russell Ranch Road which leads west from Highway 441. This position provided Deputy Bavar a command view of the land west of Highway 441.

Shortly thereafter, Deputy Bavar heard a metal to metal sound similar to a truck pulling a trailer or a rattling tailgate which appeared to be coming up the Charlie Russell Ranch Road toward Highway 441. This road was accessible to the public and although not owned by the County it was nonetheless graded by the County as far as Charlie Russell's trailer. Additionally, one of the two residents along the road requested a regular patrol by the deputy sheriffs. The private roads leading off of this road were enclosed by locked gates. The District Court found that the Charlie Russell Ranch Road was open to the public, a finding we conclude is not clearly erroneous.

Deputy Bavar advised by radio other officers responding to the area of his observations and then turned west off of Highway 441 onto the Charlie Russell Ranch Road with his headlights off. Not being able to see the oncoming vehicle on the straight road ahead, Deputy Bavar, fearing a collision, then turned on his car headlights. In clear view in front there appeared a large white one and one-half ton panel truck moving slowly with headlights off. The truck was not similar to those vehicles used in the area's cattle and citrus activities. In response to Deputy Bavar's disclosure of his position, the truck stopped and its passenger door opened as if discharging someone, however Deputy Bavar was not in a posi-

tion to see any individual depart. Thereupon, Deputy Bavar accelerated his patrol car and turned on his overhead blue flashing lights. The passenger door of the truck closed and the truck proceeded towards Deputy Bavar, both vehicles stopping ten feet apart, facing each other, about 150 yards west of Highway 441. Deputy Bavar exited his car, weapon drawn, smelled a strong odor of marijuana and ordered the driver, later identified as the appellant, to get out of the truck. Appellant was frisked, cuffed, placed under arrest, advised of his rights and placed in the rear of the patrol car of Lt. Charles Croft who had just arrived. Once placed in the car Deputy Bavar started to question him. During this initial questioning, appellant consented to a search of the truck. However, Lt. Croft and Deputy Bavar discovered that the rear door of the panel truck was padlocked and did not attempt entry at that time. Other deputies and officials began arriving on the scene.

Two deputies were sent up the Charlie Russell Ranch Road to follow the tracks of the truck driven by the appellant. At this point two gunshots were heard coming from the area south of the road near the stopped truck. Proceeding on the deputies traced the tracks of the appellant's truck to a large pasture on the north side of the road where a Convair 440 aircraft, with engines still warm, was parked facing east. Another large blue and white paneled truck was backed up to the open left rear cargo door of the plane. The plane smelled of hydraulic fuel and marijuana. The tarps covering the floor of the aircraft contained the residue of marijuana. Speed rollers led out of the rear door of the aircraft to the panel truck which contained 129 bales of marijuana weighing approximately 4,500 pounds. No persons were found in or around either vehicle. In the pasture itself were found smudgepots laid out in a U formation, apparently for use as landing lights, and some tire tracks of a vehicle equipped with mud or sand tires which appeared to have spun off and left the pasture in a northerly direction. These tracks went

through several fences and rough undeveloped land out to Highway 192 which leads to the east, to Melbourne, Florida.

Lieutenant Baker arrived at the scene soon thereafter and took command of the investigation. After inspecting and securing the area around the aircraft, he returned to the site where appellant's truck had been stopped and was advised of appellant's consent to search the truck. Lt. Baker entered the rear of the truck by use of bolt cutters and discovered inside 175 bales of marijuana packaged in black plastic and weighing approximately 6,000 pounds. Lt. Baker then questioned Deputy Bavar regarding the events surrounding the shots heard soon after the appellant's arrest and learned of how appellant's truck had appeared to stop and let off a passenger just prior to appellant's arrest. At that point, even though somewhat removed in time from the initial stop, Lt. Baker commenced a warrantless search of a zippered suitcase found lying on the passenger side in the cab of the truck. He stated that he:

> . . . felt there might be someone still out there on foot in the area. So at that time, I went in the truck and I opened the suitcase, just unzipped the top of it, to see if there might be a wallet or anything there.

*Record, Suppression Hearing* at 290. The luggage contained a fully loaded Browning .9 millimeter automatic pistol and a Marlboro cigarette package bearing a latent fingerprint of the appellant later introduced as evidence in appellant's trial.

An advance room registration receipt for the Holiday Inn at Fort Pierce, Florida found in appellant's wallet later led to the arrest of five other persons at the Holiday Inn-West in Melbourne, Florida. These individuals were indicted with the appellant on conspiracy charges. Discovered as well in Melbourne was a four wheel drive vehicle containing navigational maps, smudgepots, gas tanks and other items linked directly to the aircraft offloading operations near Holopaw, Florida.

Charges against two of appellant's co-defendants were dismissed prior to trial, the government's motion for mistrial was granted as to another and motions for judgments of acquittal were granted as to the remaining two co-defendants. The jury deliberated only as to the charges against the appellant. They returned a guilty verdict on the instruction that appellant could be convicted of conspiracy only if the evidence showed that he conspired with someone other than one of the named co-defendants due to the disposition of their charges.

In addition to the evidence cited above indicating a conspiracy, the government also showed that the Convair 440 aircraft discovered in the pasture was last seen refueling at the Tico Airport, Titusville, Florida on Sunday June 24, 1979. At that time the pilot reserved 1,700 gallons of fuel for purchase on June 26th. Also on the afternoon of June 24th the appellant checked into the Holiday Inn in Titusville using the name of "Wilson." He was in a group of approximately eight persons led by a man named Ron Lawrence, who purchased rooms for the others with cash. Two of appellant's indicted co-defendants were identified as being present in Lawrence's group.

The jury rendered a verdict of guilty on both counts and appellant was sentenced to four years imprisonment followed by a special parole term of two years, on each count, to run concurrently.

## II.

We turn first to the issue of whether Deputy Bavar had reasonable grounds to suspect that the appellant was involved in criminal activity which would justify his stop of appellant's truck. Reasonable suspicion is to be determined by considering the totality of the particular circumstances of a stop. *See, e. q., United States v. Cimino*, 631 F.2d 57, 59 (5th Cir. 1980). The stopping officer is expected to assess the facts in light of his professional experience and where there is at least minimal communications between officers, we look to the "collective knowledge" of all officers in assessing this determination. *See, e. g., Id.*, at 59; *United States v. Agostino*, 608 F.2d 1035, 1037 (5th Cir. 1979).

■ Given the degree that this determination is dependent upon the peculiar facts of the situation presented, the appearance of inconsistency, at least to advocates, is somewhat unavoidable.[1] Nonetheless it is clear that Deputy Bavar stopped appellant's truck on more than an "inarticulate hunch" based upon an awareness of something unusual occurring. *See, e. g., United States v. Montgomery,* 561 F.2d 875, 879 (D.C.Cir. 1977). The Deputy had specific articulable facts at his disposal from which he could rationally infer that the occupants of the truck were engaged in smuggling marijuana. *See United States v. Brignoni-Ponce,* 422 U.S. 873, 878–82, 95 S.Ct. 2574, 2578–2580, 45 L.Ed.2d 607 (1975); *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

There had been a *BOLO* issued for a large, low-flying inland bound aircraft flying without navigational lights which was suspected of being a smuggler. The Deputy had been pursuing exactly such an aircraft as it flew north over Osceola County when he heard the engines cut as if landing in the area. A radar loss report indicated that an aircraft did land in the area of the Deputy's observation, an area without an official airport.[2] Soon afterwards, Deputy Bavar heard and then discovered a truck, unlike most used in the area's legitimate agricultural activities, traveling after midnight, at a slow rate of speed, with its lights off, down a road leading from the area where a suspected smuggling plane had landed. Finally, when he revealed himself by turning on the headlights of his marked patrol car, the truck pulled over, stopped and let out a passenger, before turning on its lights or proceeding forward. All of this, assessed in light of its consistency with the *modus operandi* of drug smugglers, leads us to the conclusion that Deputy Bavar had ample reason to suspect criminal activity on the part of the occupants. *See United States v. Cimino,* 631 F.2d 57, 59 (5th Cir. 1980); *United States v. Soto,* 591 F.2d 1091, 1098–99 (5th Cir.), *cert. denied,* 442 U.S. 930, 99 S.Ct. 2862, 61 L.Ed.2d 298 (1979). This was no haphazard casting of the net by a police officer which snared a criminal violation, rather it was an action founded upon sound basis which foiled exactly the activity suspected. *See, e. g., United States v. Rias,* 524 F.2d 118, 120–22 (5th Cir. 1975). Therefore, we conclude that the District Court was correct in denying appellant's motion to suppress.

■ Appellant's next issue presents the most interesting question raised by his appeal, whether police in hot pursuit of an unknown fugitive with probable cause to believe identifying material is contained in luggage found in a vehicle containing contraband may conduct a warrantless search of that luggage. The Supreme Court has declared that the Fourth Amendment prohibits the warrantless search of personal luggage, absent exigent circumstances, which is discovered in a vehicle which police have probable cause to believe contains contraband. *Arkansas v. Sanders,* 442 U.S. 753, 762, 99 S.Ct. 2586, 2592, 61 L.Ed.2d 235 (1979); *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). The determination that an exigent circumstance exists in general, "depends upon the probable contents of the luggage and the suspect's access to the contents." *Arkansas v. Sanders,* 442 U.S. at 763, n. 11, 99 S.Ct. at 2593, n. 11. However, the sheer dangerousness of the instrumentality believed to be

---

**1.** *Compare United States v. Santia-Manriquez,* 603 F.2d 575, 576–78 (5th Cir. 1979) *mod. on rehearing,* 609 F.2d 1162 (5th Cir. 1980) *and United States v. Almand,* 565 F.2d 927, 928–30 (5th Cir.) *cert. denied,* 439 U.S. 824, 99 S.Ct. 92, 58 L.Ed.2d 116 (1978) *and United States v. Frisbie,* 550 F.2d 335, 337–38 (5th Cir. 1977) *with United States v. Cimino,* 631 F.2d 57, 58–59 (5th Cir. 1980) *and United States v. Agostino,* 608 F.2d 1035, 1037 (5th Cir. 1979) *and United States v. Soto,* 591 F.2d 1091, 1098–99 (5th Cir.), *cert. denied,* 442 U.S. 930, 99 S.Ct.

2862, 61 L.Ed.2d 298 (1979) *and United States v. Michel,* 588 F.2d 986 (5th Cir.), *cert. denied,* 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979).

**2.** Deputy Bavar was aware of a small airfield used only for daylight cropdusting planes in the area. His command view position on Highway 441 covered the cropdusting airfield as well as the area surrounding the Charlie Russell Ranch Road. *Record, Suppression Hearing* at 34–35.

contained in the luggage may vitiate the need to consider a suspect's access to the contents as in the case of a bomb, *United States v. Newbourn*, 600 F.2d 452, 456 (4th Cir. 1979), or a loaded spring triggered pistol, *United States v. Moschetta*, 646 F.2d 955 (5th Cir. 1981). *Cf. Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).

In this instance the government contends that exigent circumstances existed for their warrantless search in "the need to obtain evidence of the identity of criminal confederates in order to apprehend them and insure the safety of law enforcement personnel." *Appellee's Brief* at 16. This contention attempts too much. A panel of this Court once before rejected the mere need to identify co-conspirators as too broad a justification for warrantless searches. *United States v. Soriano*, 482 F.2d 469, 474 (5th Cir. 1973) *modified in part on rehearing en banc*, 497 F.2d 147 (5th Cir. 1974).[3] Further, what danger was presented to law enforcement personnel in this fact situation is problematical.[4] Rather, as correctly identified by the District Court, "[t]he exigency with respect to the search of the two pieces of luggage lay in the need to make a quick discovery of the identity of the other conspirators in order to block their flight", *Record on Appeal* at 266, in two words "hot pursuit".[5]

■ Lt. Baker had probable cause to believe that an armed confederate of the appellant was at large, on foot, and hence within their grasp for several reasons. First, appellant's passenger apparently made an unscheduled exit from a vehicle loaded with 175 bales of marijuana in response to being confronted with a marked patrol car's headlights. Second, the luggage was found on the passenger side of the cab instead of stowed securely elsewhere under the driver's sole control. Third, the shots fired apparently came from the south at some distance from the only evidence of any escape vehicle which fled in the opposite direction. Fourth, if the fugitive on foot had no access to a vehicle, there were only two residences in the immediate area which could harbor the fugitive until escape was possible or any incriminating evidence was destroyed. Finally, it was rational for the police to assume that since the contraband was probably smuggled in by plane from a foreign country, identity papers of some sort might be contained in the luggage discovered in a vehicle into which the plane had been off-loaded.

■ Therefore, not only did the police have probable cause to believe that the luggage contained identifying information on a fugitive near at hand, but the circumstances also demonstrated the need for prompt action. However, this conclusion does not end our inquiry. We must look to the policy considerations which underpin the exigent circumstances doctrine in order to assess the appropriateness of extending it to this fact situation.

---

**3.** The Court stated that

"The only exigent circumstance advanced by the government in this case is that opening the suitcases immediately might have disclosed information which possibly would have led to the capture of others participating in the narcotics operation. This does not stand constitutional scrutiny. The argument proves too much. If this court were to accept as legitimate the government's loosely defined concept of exigent circumstances, scarcely a case would remain in which a warrantless search for narcotics would not be justified. There is almost always a chance that newly discovered evidence will ensnare unknown accomplices."

482 F.2d at 474.

**4.** The shots heard near the truck were apparently not directed at anyone and occurred quite some time before Lt. Baker's search. On the other hand the police would certainly be justified in assuming that the fugitive on foot was armed and probably dangerous.

**5.** In *Soriano, supra* the defendants were the subject of a continuous purposeful police surveillance rather than surprised by a quick reaction police raid late at night in an isolated area while offloading a large amount of contraband. Further, the officers in *Soriano* were in a large metropolitan area and at the time of the luggage search a Magistrate was executing a search warrant for the house from which the police had observed the defendants depart with the suitcases. Finally, the officers in *Soriano* acknowledged that their primary purpose in searching the bags was to seize contraband, not as in the present case, solely to identify a fleeing suspect. 482 F.2d at 474, n. 7(b), 482.

The Supreme Court has declared that "the mere reasonableness of a search assessed in the light of the surrounding circumstances, is not a substitute for the judicial warrant required under the Fourth Amendment." *Arkansas v. Sanders*, 442 U.S. at 758, 99 S.Ct. at 2590. *See United States v. United States District Court*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). There must be something more than reasonableness to justify an exception to the Warrant Requirement. Such exceptions, founded upon the public interest requirement for some flexibility in the application of the general rule, arise in "those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for recourse to a neutral Magistrate." *Arkansas v. Sanders*, 442 U.S. at 759, 99 S.Ct. at 2590–2591; *United States v. United States District Court*, 407 U.S. at 318, 92 S.Ct. at 2137.

The exigent circumstances doctrine recognizes several common situations where the time consuming resort to a neutral magistrate for an arrest or search warrant is unnecessary, for example: hot pursuit, *United States v. Santana*, 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–2410, 49 L.Ed.2d 300 (1976); *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), fleeing suspect, *United States v. Williams*, 612 F.2d 735, 739 (3rd Cir. 1979), *cert. denied*, 445 U.S. 934, 100 S.Ct. 1328, 63 L.Ed.2d 770 (1981); *United States v. Gardner*, 553 F.2d 946, 948 (5th Cir. 1977), *cert. denied*, 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 753 (1978), danger to arresting officers or the public from the suspect or the contents of a container, *United States v. Moschetta*, 646 F.2d 955 (5th Cir. 1981); *United States v. Flickinger*, 573 F.2d 1349, 1355 (9th Cir.), *cert. denied*, 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978), mobility of the vehicle, *Chambers v. Moroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970);

*United States v. Mitchell*, 538 F.2d 1230, 1232–33 (5th Cir. 1976), *cert. denied*, 430 U.S. 945, 97 S.Ct. 1578, 51 L.Ed.2d 792 (1977), or mobility of containers which could not be detained without thwarting efforts to discover other conspirators, *United States v. De La Fuente*, 548 F.2d 528, 538–39, n. 14 (5th Cir.), *cert. denied*, 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977), *United States v. Hand*, 516 F.2d 472, 474–76 (5th Cir. 1975) (En Banc), *cert. denied*, 424 U.S. 953, 96 S.Ct. 1427, 47 L.Ed.2d 359 (1976). The doctrine applies equally to warrantless seizures of persons or property because both acts implicate the same privacy interests and deserve the same level of constitutional protection. *Payton v. New York*, 445 U.S. 573, 588–89, 100 S.Ct. 1371, 1381–1382, 63 L.Ed.2d 639 (1980).

In the present case, it appears that a combination of hot pursuit, the immediate need to discover fleeing conspirators and the danger posited by the possibility of an armed fugitive remaining at large, late at night, in a rural area supplied sufficient exigent circumstances to justify Lt. Baker's opening of the luggage and his cursory search for identification. *See United States v. Stubblefield*, 621 F.2d 980, 982 (9th Cir. 1980); *United States v. Flickinger*, 573 F.2d 1349, 1355 (7th Cir.), *cert. denied*, 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978); *United States v. De La Fuente*, 548 F.2d 528, 538–39, n. 14 (5th Cir.), *cert. denied*, 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977). Given the time period involved and the equivocal nature of the contents sought in the luggage, this is perhaps a close call.[6] Nonetheless, we consider that speed was still essential and recourse to a Magistrate at that time and from that place too time consuming.

The Fourth Amendment does not require police officers to delay in the course of an investigation to let fugitives escape once the net has been thrown, nor to endan-

---

6. Knowing the identity of the fugitive no doubt would have aided the police in extending their hot pursuit. However, the need for evidence of the identity of co-conspirators is apparent in all investigations whether "hot" or "cold". Therefore, the circumstances of this investigation are crucial to our determination. *Compare Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) *and Steagald v. United States*, —— U.S. ——, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) with *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) *and Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

ger the lives of the police or the public while procuring a warrant.[7] *Cf. Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–1646, 18 L.Ed.2d 782 (1967). By quickly identifying the fugitive on foot police would have been better able to focus their pursuit and warn the public of any immediate danger. Delaying for an appreciable period of time while obtaining a warrant, would have only let the trail grow cold. Therefore, we conclude that the societal costs of delay outweigh the social interest in resort to a neutral Magistrate in this instance.

It should be noted that this is not a case wherein the police merely sought to avoid the inconvenience of obtaining a search warrant. *See, e. g., G. M. Leasing Corp. v. United States*, 429 U.S. 338, 359, 97 S.Ct. 619, 632, 50 L.Ed.2d 530 (1977). Rather, any time delay was caused by the logistics of discovering the offload operation and securing the site. Therefore, we find that the District Court was not clearly erroneous in its determination that exigent circumstances justified the warrantless search of appellant's luggage and we uphold his denial of appellant's motion to suppress. *United States v. Metz*, 608 F.2d 147, 154 (5th Cir. 1979), *cert. denied*, —— U.S. ——, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980).

Having sustained the denial of motions to suppress which went to appellant's conviction on the substantive count, it is unnecessary for us to discuss, in light of the concurrent sentence doctrine, appellant's conviction on the conspiracy count. *See United States v. Tasto*, 586 F.2d 1068, 1069 (5th Cir. 1978), *cert. denied*, 440 U.S. 928, 99 S.Ct. 1263, 59 L.Ed.2d 484 (1979); *United States v. Canales*, 527 F.2d 440, 441–42 (5th Cir. 1976). However the merits of this point of appeal bear some comment.

 Even though the District Court's jury instruction was incorrect, in that dismissal of charges against a co-conspirator prior to attachment of jeopardy does not bar the conviction of another conspirator, *United States v. Coronado*, 554 F.2d 166, 171, n. 7 (5th Cir.), *cert. denied*, 434 U.S. 870, 98 S.Ct. 214, 54 L.Ed.2d 149 (1977); *Feldstein v. United States*, 429 F.2d 1092, 1095 (9th Cir.), *cert. denied*, 400 U.S. 920, 91 S.Ct. 174, 27 L.Ed.2d 159 (1970), this error only inured to the appellant's advantage. *Cf. Cacace v. United States*, 590 F.2d 1339 (5th Cir. 1979). Despite this increased burden our review of the testimony and exhibits shows that there was ample evidence to support the jury's conclusion that there was a conspiracy and that appellant participated in it.[8] *Id.* Therefore, the conviction of appellant on all counts and the decision of the District Court in all regards is *AFFIRMED*.

---

7. The dangerousness here involved the assumption that the fugitive was armed with a shotgun. Nonetheless, the sheer risk of injury placed on the public by the remote chance that a fugitive could reach the dangerous contents of a container would also justify a warrantless search. *Cf. United States v. Picariello*, 568 F.2d 222 (1st Cir. 1978) (warrantless entry and securing of home justified where police feared fugitive at large might return, retrieve dynamite and use in series of bombings.)

8. Although the testimony regarding appellant's activities on June 24th at the Titusville Holiday Inn only shows that he kept bad company and as such would not support a conviction, *see United States v. Waddy*, 536 F.2d 632 (5th Cir. 1976), viewing the evidence of this large off load operation in the light most favorable to the government, there was ample evidence for a jury to conclude that appellant participated in a conspiracy which numbered more than six.