UNITED STATES of America,
Appellant,

v.

Steven Dale NEWBOURN, Appellee.

UNITED STATES of America,
Appellant,

v.

Larry Steven JEFFERY, Appellee.

Nos. 76–2267, 76–2270.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 12, 1978.

Decided June 29, 1979.

J. Timothy DiPiero, Asst. U. S. Atty. (Robert B. King, U. S. Atty., Charleston, W. Va., on brief), for appellant.

James M. Cagle, Charleston, W. Va., for appellee.

Before HAYNSWORTH, Chief Judge, and BUTZNER and PHILLIPS, Circuit Judges.

HAYNSWORTH, Chief Judge:

On the shoulder of a rural road in West Virginia an automobile was parked, its trunk loaded with a quantity of stolen firearms. Newbourn and Jeffery, after parking the vehicle there, left it to enter the cab of a pickup truck, which had followed them there, and were attempting to sell the guns to the driver of the pickup truck, an under-

cover police informant. Four police officials, having previously received information from the informant, arrived upon the scene. They arrested Newbourn and Jeffery, procured the keys to the automobile and opened the trunk where the guns were stored.

After a pre-trial suppression hearing, the district judge concluded that it would have been practical for the officers to have obtained a search warrant and held that, since they failed to do so, the search was unlawful. The United States has brought this interlocutory appeal from the suppression order, and we now reverse.

## I.

At about 10 o'clock at night Dennis Allen, an informant of known reliability, telephoned Butch Carte, an investigator for Wyoming County, West Virginia, to inform him that Jeffery had offered to sell him a "bunch" of stolen firearms the next morning. According to Allen, Jeffrey had informed him that he would be coming to West Virginia from Ohio and would be accompanied by a man named Steve.[1] It was agreed between Allen and Carte that Allen would telephone Carte early the next morning after receiving further instructions from Jeffrey.

At about 5 o'clock the next morning Allen again called Carte. He told Carte that he had heard from Jeffery who had directed Allen to meet him at a designated motel in the Hanover area. At about 6 o'clock that morning Carte and two deputies arrived at Allen's house and the men worked out a code for use on the C.B. radio. The three officers then drove to the home of a fourth. There, a bit later, Carte received a radio communication from Allen that he had met Jeffery at the motel and had been told to go down state route 9 toward a known landmark. Jeffery and Newbourn, his companion, drove down Route 9 while Allen followed in his pickup truck. Having received Allen's message, the four investigators also headed down Route 9, expecting to come upon the other two vehicles or to receive further instructions over the radio from Allen. They arrived upon the scene shortly after Jeffery and Newbourn had pulled to the side of the road and joined Allen in the cab of his pickup truck to undertake the negotiation of a sale of the weapons.

Jeffery and Newbourn were immediately arrested and frisked. From Jeffery the policemen obtained the keys to the vehicle and opened its trunk.

There is no suggestion that there was not probable cause to search the trunk of the vehicle. The only question is whether the warrantless search was within the automobile exception to the warrant requirement of the Fourth and Fourteenth Amendments. The district court held that it was not, saying:

> It must be remembered that at no time during the arrest were the defendants closer than twenty feet to the automobile holding the weapons. There was no danger to the arresting officers that one of the defendants would be able to reach the weapons. The defendants were clearly in custody and would not have been permitted to leave in the automobile. Hence the inherent mobility of the automobile is irrelevant here. In short, all the officers needed to do was to pick up a search warrant on the way to the arrest scene, or to hold the defendants at the scene while one or two officers accompanied Dennis Allen to the magistrate and obtained a search warrant. Neither of these simple acts was done."

We accept the district court's finding that the officers could have procured a search warrant after they came upon the scene and had arrested Jeffery and Newbourn. Some of the officers could have guarded the two arrested men and the vehicle to assure its immobility while one or more went to a magistrate to obtain a search warrant, though any such procedure may have posed

---

1. This fact and the entire body of surrounding circumstances known to the officers at the time of arrest supplied ample probable cause for Newbourn's arrest.

**454**

security problems.[2] We disagree, however, that that fact removes this case from the automobile exception to the warrant requirement.

## II.

■ Since 1925, the Supreme Court has recognized "a distinction between the necessity for a search warrant in the searching of private dwellings and in that of automobiles * * *." *Carroll v. United States*, 267 U.S. 132, 147, 45 S.Ct. 280, 283, 69 L.Ed. 543 (1925). The mobility of automobiles was recognized as a crucial factor, for it carries with it a high potential of frustration of the normal process of applying for and obtaining a warrant in advance of a search. More recently, it has been recognized that the automobile exception rests upon other considerations than mobility of the vehicle and the possibility that it and its contents may be concealed or removed from the jurisdiction. There is a diminished privacy interest of a motorist operating a vehicle on our public streets and highways. *South Dakota v. Opperman*, 428 U.S. 364, 367–68, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1975). Though there be no probable cause to believe that an impounded vehicle contains contraband or evidence of crime, a routine inventory of its contents is permitted to protect the police or custodians from possible physical danger, to avoid disputes over lost property, and to serve the owner's interest against loss or damage to the contents of his automobile. *Id.* at 369, 96 S.Ct. 3092. Though there be no probable cause to believe that any crime has been committed, in some circumstances an automobile reasonably thought to contain a legal handgun may be searched without a warrant by state officers in keeping with the state's broad regulatory role in aid of public safety and security in light of problems confronting a small law enforcement office. *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). In *Cady* the Court distinctly recognized that past decisions had sustained warrantless searches of vehicles by state police officials despite a "remote if not nonexistent" possibility that the vehicle or its contents would be removed or destroyed. *Id.* at 441–42, 93 S.Ct. 2523. Thus there are a variety of considerations which support a broad automobile exception to the warrant requirement and recognition that "for the purposes of the Fourth Amendment there is a constitutional difference between houses and cars." *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 1982, 26 L.Ed.2d 419 (1970).

■ Here the automobile exception applies both because the officers reasonably believed that the vehicle contained a cache of weapons potentially dangerous to the public if in the wrong hands, and because of the potential mobility of the vehicle parked on the shoulder of a public road.

### A.

In *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) a drunken driver wrecked his car in a rural area of Wisconsin. The driver informed investigating officers that he was a Chicago policeman. After the wrecked vehicle had been towed to a storage lot some seven miles from the nearest police station, and the injured driver had been carried to a hospital where he lapsed into a coma, one of the officers recalled an impression that every Chicago policeman was required to have a service revolver with him at all times. He returned to the wrecked vehicle to retrieve the weapon, such an effort to secure weapons being "standard procedure" at the department. During the course of his inspection, the policeman opened the trunk of the wrecked vehicle where he discovered blood stained objects, later used in the prosecution of the driver for murder. Since the trunk of the vehicle might have been opened by vandals, the possible presence of a revolver in it posed a potential public danger. Because of that and because of the state's extensive regulatory control of motor vehicles, the warrantless search was upheld.

---

**2.** The interest of security suggests that persons placed under arrest for an offense punishable by imprisonment should be gotten to a place of confinement as soon as reasonably practical.

There is no practical distinction between this case and *Cady*. There was more than an impression or suspicion that the automobile's trunk contained a gun; there was probable cause to believe that it contained a whole cache of guns. Unless secured, they might fall into the hands of the arrested men, or vandals, or thieves. Thus they posed potential danger both to law enforcement officials and to members of the general public. The defendants were present when the officers arrived on the scene, and unless they were placed under the constraints of arrest and the car searched and the guns seized, the potential danger presented by the guns was substantially greater than that posed by the abandoned revolver in *Cady*.

There are other factual parallels between this case and *Cady*. In each case there was a locked automobile trunk that was opened. In each case the actors were state officials, not federal, authorized to perform the state's regulatory role and its "community caretaking functions." *See Cady, supra*, at 441, 93 S.Ct. 2523. In each case the actors were members of a small rural law enforcement agency. Each vehicle was already in police custody, in *Cady* by necessity and here implicitly as a result of the arrest of the defendants and the obvious purpose of the officers to exclude the defendants and everyone else from access to the guns believed stored in the automobile.

■ In *Cady* the trunk was not opened and searched until after the vehicle had been removed to a storage lot, but such removal does not enlarge the right to search without a warrant. Indeed, after the arrest of the defendants, the law should favor, not disfavor, an immediate search on the side of the road upon probable cause to believe that a number of weapons are stored in the trunk. An immediate search minimizes the danger both to the public and to the police by facilitating full police understanding of the situation and immediate control of the guns. It provides a

means for prompt readjustment if it should be found that a mistake had been made. If it had transpired that there were no guns in the automobile, the whole thing having been a hoax, these defendants would have been released and allowed to go on their way. Immediate search is calculated to minimize restraints upon the freedom of the innocent. If a delayed search at the police station may be upheld because a warrantless search at the place of arrest would have been lawful,[3] the validity of this on-the-spot search is not to be questioned because the search was immediately effected on the scene and not delayed.

■ It is true that in *Cady* the intent of the officer was benign. He had no reason to believe that a search of the vehicle would produce evidence of criminal conduct. He thought he was exercising only his care-taking function, and the Court emphasized conformance to standard procedures. *Cady* is thus related to *South Dakota v. Opperman, supra*, and the class of inventory searches. While the opinions in both *Cady* and *Opperman* clearly disclose the fact that the officers were not seeking evidence of crime, in each case the words of the opinions were used descriptively and not as limitations upon the reach of the automobile exception.[4] In each case the emphasis upon the non-criminal police contacts with motorists and their automobiles simply bolsters the conclusion that anyone who drives a vehicle upon the public streets and highways surrenders a substantial expectation of privacy. The officers' motivation should not enlarge the motorist's diminished expectation. Indeed, in the inventory search situation, the police must know that sometimes dangerous instruments or substances or evidence of crimes will be uncovered. They may have more or less reason to believe that some such thing may be found in a particular car, but the right to conduct the inventory ought not to vanish if the reason be more rather than less.

---

3. *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

4. *But see* Note, Warrantless Searches and Seizures of Automobiles, 87 Harv.L.Rev. 835, 850–53 (1974).

Surely this must be so when the justification for the search is the probable cause to believe that the vehicle contains dangerous weapons. The policeman's function in protecting the public from the irresponsible use of dangerous weapons is not in the least inconsistent with a purpose to uncover evidence of crime. The presence of the latter purpose in no way undermines the legitimacy of the former. An interest in furthering a criminal investigation supplements justifiable concern about hazards presented by an automobile's contents; it does not negate it, and *Cady* supports the warrantless intrusion. Thus the warrantless search should be upheld, whatever the policeman's subjective state of mind if the objective facts present a reasonable basis for a belief that there is a potential danger similar to or greater than that presented in *Cady*, which danger should be inactivated.

This was not a routine search, but it was the potential hazard reasonably believed to be present in *Cady* which justified the warrantless search there. The much larger potential hazard reasonably believed to be present here justified the search in this case.

### B.

The warrantless search of the trunk of the car was also authorized as a fleeting vehicle search under *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). *See also Texas v. White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975); *id.* at 70, 96 S.Ct. at 306 (Marshall, J., dissenting) ("immediate at-the-scene search . . was clearly permissible").

In *Chambers* it appeared that, following a robbery, a description of the vehicle in which the robbers had escaped the scene was broadcast over police radio. Within an hour, police officers encountered a vehicle fitting the description of the escape vehicle. They arrested the driver and passengers and took the automobile to the police station. There it was searched, and evidence of the robbery was found concealed in a compartment beneath the dashboard.

In sustaining the seizure of the vehicle and its subsequent warrantless search, the Supreme Court said:

> Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the "lesser" intrusion is permissible until the magistrate authorizes the "greater." But which is the "greater" and which the "lesser" intrusion is itself a debatable question and the answer may depend upon a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment. 399 U.S. at 51–52, 90 S.Ct. at 1981.

Any suggestion here that the Fourth Amendment requires that the officers delay the search after effecting the arrest until they had obtained a warrant to search the automobile is simply inconsistent with *Chambers*. If a warrantless search of the vehicle after its impoundment and removal to the police station was authorized, so was a warrantless search on the roadside, a potentially lesser intrusion into the privacy of these defendants. *See Texas v. White, supra* (Marshall, J., dissenting). The search should be invalidated, therefore, only if there were no exigent circumstances and the police officials had ample opportunity to obtain a search warrant before arrest.

If Carte had enough information, after first hearing from Allen, to persuade a magistrate that there was probable cause to search Jeffery's vehicle, *see Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), the information sufficed only by an eyelash, *see Aguilar v. United States*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and his affidavit would have to have been drawn with punctilious care. Carte testified that Allen was a reliable informant who had given him accurate informa-

tion on three prior occasions and that Allen had received his information directly from Jeffery. But Carte had no great corroborating information until he reached the scene where the two vehicles were parked on the side of the road. Allen had not provided Carte with detailed information, for Jeffery had not spoken in detail, and Carte had no indication other than Allen's tip that Jeffery had or was about to commit a crime. *See Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

Allen's early morning telephone call, reporting the second conversation with Jeffery, and his radio transmission, reporting the direction in which he and Jeffery were proceeding, enhanced the likelihood that a sufficient showing of probable cause to search could have been made, but by that time the opportunity to obtain a warrant was greatly diminished. The officers thought they should "take off pretty fast" to overtake the Jeffery and Allen vehicles since they believed those two vehicles were well ahead of them. Moreover, there was little time between Allen's phone call at 5 o'clock in the morning and his radio transmission. Promptly after receiving that call, Carte had called Deputy Rust, whose car with snow tires Carte wished to use on the icy mountain roads. Deputies Davis and Rust then met and proceeded to Carte's house, from whence the three then went to Allen's house, arriving at about 6 o'clock. After setting up the radio code they were to use, the three officers proceeded to the "Hanover area" to meet Constable Blankenship. The radio transmission from Allen came only ten minutes later. Thus the officers had been busily engaged in assembling, arranging a code for the radio transmission and placing themselves in a position to trail the two vehicles pursuant to Allen's expected directions.

While the information Carte obtained in Allen's first telephone call marginally may have established probable cause to search a vehicle, there was a grave problem in satisfying the particularity requirement. He had been told that Jeffery and a man named Steve were expected to be driving in a "motor vehicle." He knew nothing of the kind of motor vehicle to expect or by whom it might be owned. He could have sought only a warrant authorizing a search of any vehicle in which Jeffery might be riding the next morning.

■ If, under *Chambers*, an opportunity to obtain a search warrant prior to the seizure of an automobile invalidates its search, the opportunity must be plain and ample. As events develop and new information is received, police officials are not required to hasten to a magistrate when a minimal probable cause showing arguably might have been made. Nor need they make detours to a magistrate's office at the risk that events may pass them by. At least when probable cause is marginal, particularization difficult and the opportunity to reach a magistrate uncertain, the failure to seek a search warrant does not render a vehicle search on the side of the public highway unlawful after ample probable cause to search has been obtained. *See Husty v. United States*, 282 U.S. 694, 701, 51 S.Ct. 240, 75 L.Ed. 629 (1931).

The defendants, of course, rely upon *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), and *United States v. Bradshaw*, 490 F.2d 1097 (4th Cir. 1974). In each of those cases, however, the searched vehicle was not on any public highway; it was parked unoccupied on the private property of its owner. As the Supreme Court said in *Coolidge*:

> "[T]here is a significant constitutional difference between stopping, seizing, and searching a car on the open highway, and entering private property to seize and search an unoccupied, parked vehicle not then being used for any illegal purpose." 403 U.S. at 463, n.20, 91 S.Ct. at 2036.

Even if the vehicle is parked on the private property of its owner when searched, a warrant is not a prerequisite if it got there only after close pursuit. *Scher v. United States*, 305 U.S. 251, 254–55, 59 S.Ct. 174, 83 L.Ed. 151 (1938). Clearly the search of this vehicle parked on the shoulder of a public road is controlled by *Chambers* and not by *Coolidge*. The plurality opinion in *Cardwell v.*

458

*Lewis,* 417 U.S. 583, 593, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974), explicitly recognizes that there is a distinguishing difference in the expectation of privacy when a vehicle is traveling, or is parked, on a public road and when parked in its owner's yard.

Moreover, in neither *Coolidge* nor *Bradshaw* was there any reason to suppose that the vehicle contained any weapons or dangerous instruments.

Here the circumstances were genuinely exigent. The vehicle was parked on a public roadway. Its owner and passenger were close at hand and in possession of the keys. After the appearance of the officers, there is no doubt that the defendants would have fled in the vehicle had they not been arrested and the vehicle seized. To the extent that the exigent circumstances requirement survives *Cady, Cardwell,* and *Opperman,* it was met here.

### III.

The warrantless search of the trunk of this vehicle for the weapons it was reasonably believed to contain was lawful both as a protective search under the *Cady* principle and as a fleeting vehicle search under *Chambers.* The motion to suppress should have been denied.

*REVERSED.*