**UNITED STATES of America,
Plaintiff,**

v.

**Andres PAREDES, Defendant.**

**Cr. No. 04–00131JMS.**

United States District Court,
D. Hawai'i.

Aug. 12, 2005.

Shanlyn A.S. Park, Office of the Federal Public, Michael A. Weight, for Defendant.

Edric Ming–Kai Ching, U.S. Attorneys, Honolulu, HI, for Plaintiff.

*ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS*

SEABRIGHT, District Judge.

Defendant Andres Paredes seeks an order from the court suppressing evidence obtained as a result of a search of his vehicle as well as both pre-search and post-search statements Paredes made to law enforcement officials.

On August 1 and 3, 2005, the court received oral testimony from: (1) Honolulu Police Department (HPD) Officer Duane Espinueva; (2) HPD Officer James Dean Goeas; (3) HPD Officer Scott Kobayashi; (4) HPD Officer John Oliver; (5) HPD Officer Charles Remington; (6) Brian Kunishige, Owner and Manager of Oahu Towing;[1] and (7) Douglas Yokooji, Tow Technician for Oahu Towing. After reviewing the motion, the supporting and opposing memoranda, the testimony of the witnesses, and the arguments of counsel, the court GRANTS in part and DENIES in part the motion to suppress.

## I. BACKGROUND

At approximately 5:12 a.m. on March 12, 2004, Paredes struck and killed a pedestrian while driving a Subaru station wagon along Diamond Head Road. HPD Officers Kobayashi and Oliver were the first law enforcement officials to respond to the scene. At the time, Officer Oliver was in training, with Officer Kobayashi serving as Officer Oliver's Field Training Officer.

Officer Kobayashi instructed Officer Oliver to tend to Paredes because Paredes appeared distraught and because Officer Kobayashi was afraid that Paredes might "lose it." At one point, when Officer Kobayashi and several other Officers were talking with one another, Paredes yelled, "Stop laughing at me," despite the fact that no one was laughing at Paredes at any point in time. Officer Oliver sat with Paredes for thirty to forty-five minutes. During this time Paredes appeared upset and distraught and was observed crying and talking to himself. Officer Oliver did not ask Paredes any questions during this time, although he did talk to Paredes in an effort to calm him down. Officer Oliver testified that Paredes did not seem to respond to his efforts.

Officer Oliver testified that, at approximately 7:00 a.m., Paredes stated that he had a registered shotgun in his car, along with ammunition kept separate from the shotgun. Officer Oliver testified that this was the first of Paredes's statements that seemed directed towards him. Prior to this statement, Officer Oliver believed that Paredes was talking to himself only.

Less than one minute after making this statement about the shotgun and ammunition, Paredes asked Officer Oliver the following: "If I charged you, would you have to shoot me?" Officer Oliver responded by saying, "No," after which Paredes pulled a

---

1. The actual name of Mr. Kunishige's company appears to be Oahu Auto Service; however, the witnesses throughout these proceedings referred to this company as Oahu Towing, and this order will refer to Oahu Towing for ease of reference.

knife from his back pocket and asked, "What if I had a knife like this one?" Officer Oliver drew his gun and instructed Paredes to drop the knife. Officers Espinueva and Remington heard Officer Oliver yelling at Paredes and they, in turn, drew their guns and pointed them at Paredes. When the three HPD Officers had their guns pointed at Paredes, Paredes said something to the effect of, "Just shoot me." After one or two minutes, Paredes dropped the knife and was handcuffed by Officer Espinueva. The Officers at the scene decided to transport Paredes to Queen's Medical Center ("Queen's") for a psychiatric evaluation. Officers Espinueva and Remington then escorted Paredes to Queen's, leaving the scene of the accident at approximately 7:23 a.m. and arriving at Queen's around 7:52 a.m.

The HPD Officers did not search Paredes's car at the scene of the accident. At approximately 8:40 a.m., Douglas Yokooji, an employee of Oahu Towing, arrived at the scene to tow Paredes's car. He left the scene around 8:50 or 8:55 a.m. and arrived at the Oahu Towing yard ten to fifteen minutes later.

While waiting in an evaluation room at Queen's to be examined, Paredes was not handcuffed. Nevertheless, he was not free to leave, with Officers Espinueva and

Remington waiting nearby. At one point, when Officer Espinueva was standing in the doorway of the evaluation room and Officer Remington was just outside the room, Paredes told Officer Espinueva, "I gotta tell you something, Officer."[2] Officer Espinueva advised Paredes to remain quiet, but Paredes again stated that he needed to say something to Officer Espinueva. Officer Espinueva then said something to the effect of "okay, what's up?" Paredes replied: "I get one gun in the car, not loaded, but it's a shotgun, HK Benelli, I bought from Young Guns about one month ago." Officer Espinueva asked Paredes to identify the location of the shotgun in the car, and Paredes replied that the gun was in the trunk, underneath the carpet. Officer Espinueva then asked if the gun was loaded, and Paredes communicated that it was not and that the ammunition was in the center console of the car.[3] Officer Espinueva asked Paredes why he wanted to turn in the shotgun, and Paredes replied, "So nobody use 'em'." Officer Espinueva asked Paredes if he meant "for safekeeping," and Paredes nodded his head so as to indicate "yes."

At this point, Officer Espinueva believed that Paredes may have violated Hawaii Revised Statutes (HRS) § 134–6 (Supp. 2004)[4] by keeping a shotgun in his car.[5]

2. This entire conversation at Queen's is reflected in Officer Espinueva's report, which was admitted into evidence as Defendant's Exhibit 1.

3. Specifically, Paredes stated, "No, the rounds stay in the stuff." Officer Espinueva asked, "What stuff?," after which Paredes motioned to his right side as though to point out where the center console of the car would be. Officer Espinueva asked if Paredes meant the center console, and Paredes said "Yeah."

4. HRS § 134–6, entitled "Carrying or use of firearm in the commission of a separate felony; place to keep firearms; loaded firearms; penalty," provides in relevant part:

(c) Except as provided in sections 134–5 [ (entitled "Possession by licensed hunters and minors; target shooting; game hunting")] and 134–9 [ (entitled "Licenses to carry")], all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms or ammunition or both in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following: a place of repair; a target range; a licensed dealer's place of business; an organized, scheduled firearms show or ex-

At approximately 11:09 a.m. on March 12, 2004, Paredes signed a document in which Paredes purported to consent to a search of his automobile. This document specifically stated that the police were searching his automobile for a shotgun and ammunition. After signing this document, Paredes was admitted to Queen's for observation.

Officers Espinueva and Kobayashi then went to Oahu Towing to search Paredes's automobile. The Oahu Towing lot is fenced and is staffed twenty-four hours a day, seven days a week. Oahu Towing is a private company; in other words, HPD does not control or operate the tow yard. Once HPD turns a vehicle over to Oahu Towing, Oahu Towing can release that vehicle to the owner's designee without HPD consent.

Officer Kobayashi obtained the keys to Paredes's car from Brian Kunishige, owner of Oahu Towing. Officers Kobayashi and Espinueva searched the trunk[6] of the vehicle and discovered a shotgun in the compartment designed for a spare tire. The Officers then searched the center console of the car and discovered, among other things, shotgun ammunition and a crystalline substance (which Officer Kobayashi believed to be crystal methamphetamine). Officers Espinueva and Kobayashi completed their search and left Oahu Towing sometime between 1:20 p.m. and 1:30 p.m.[7] That Officers Espinueva and Kobayashi did not have a warrant to conduct this search is undisputed.

Paredes was released from Queen's on March 13, 2004, and was arrested by HPD for negligent homicide that same day. The first time Paredes was apprised of his *Miranda* rights was on March 13, 2004, after his release from Queen's. In other words, Paredes was not apprised of his *Miranda* rights until after he had informed Officer Oliver that there was a shotgun and ammunition in the car, after

hibit; a place of formal hunter or firearm use training or instruction; or a police station. "Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

5. Apparently, Paredes also informed Officer Espinueva that he (Paredes) had informed someone at the scene (presumably Officer Oliver) of the shotgun as well. The record is unclear as to how Paredes communicated this information to Officer Espinueva. Upon learning that Paredes had a shotgun and ammunition in his car, Officer Espinueva called Officer Kobayashi to find out if Officer Kobayashi had any information as to the shotgun. Officer Kobayashi stated that he did not; Officer Kobayashi then spoke with Officer Oliver, at which point Officer Oliver informed Officer Kobayashi for the first time of Paredes's earlier statement concerning the shotgun. Officer Kobayashi did not include this information in his reports.

6. The automobile in question was a station wagon, which technically had a rear "hatch" rather than a "trunk." Officer Kobayashi discovered the shotgun in the rear portion of the vehicle. This order refers to this area of the vehicle as the "trunk" for ease of reference.

7. Mr. Kunishige testified that he believed the vehicle arrived at the Oahu Towing lot at approximately 9:15 a.m. and that the HPD Officers arrived within an hour thereafter. In other words, Mr. Kunishige's testimony suggests that HPD searched Paredes's car before Paredes signed the document purporting to consent to a search of his car. As an initial matter, the court finds Officer Kobayashi's testimony credible as to the timing of the search: although the court does not find that Mr. Kunishige provided intentionally false testimony, the court is not persuaded that Mr. Kunishige had sufficiently clear recollection as to the timing of events that occurred more than one year prior to his testimony. Notwithstanding, as discussed *infra*, the court concludes that the issue of Paredes's consent is moot because the police did not need Paredes's consent to search the automobile without a warrant.

he had informed Officer Espinueva that there was a shotgun in the car, after Officer Espinueva had questioned him about the specific location of the shotgun and ammunition within the car, and after Paredes had signed the document purporting to give his consent to search his car.

On May 18, 2005, a federal grand jury issued a first superseding indictment, charging Paredes with five counts: possessing crystal methamphetamine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1); being an unlawful user of controlled substances in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2); being an unlawful user of controlled substances in possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2); and making a false statement in the acquisition of a firearm, in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2). Paredes filed the instant motion to suppress on June 15, 2005.

## II. *ANALYSIS*

Paredes asks the court to suppress the following: (1) his pre-search statements to HPD that he had a shotgun and ammunition in the car [hereinafter, "Paredes's pre-search statements"]; (2) the items recovered from the car; and (3) any post-search statements he made to law enforcement officials concerning the items recovered from his car [hereinafter, "Paredes's post-search statements"]. The court grants Paredes's motion to suppress as to his responses to Officer Espinueva's final two pre-search questions at Queen's—Paredes's statements that he wanted to turn in the shotgun for safekeeping and "[s]o nobody use 'em' "—because Officer Espinueva's questions constituted "custodial interrogation" and because no exception to *Miranda* applies.

Aside from these two statements, however, Paredes's pre-search and post-search statements are admissible. Paredes spontaneously informed Officer Oliver about the shotgun and ammunition in the car, and spontaneously informed Officer Espinueva about the shotgun in the car, such that these initial pre-search statements need not be suppressed. After Paredes told Officer Espinueva that he had a shotgun in his car, Officer Espinueva was entitled to question Paredes about the shotgun pursuant to the "public safety exception" outlined in *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), although Officer Espinueva's final two questions exceeded the scope of this exception (and therefore will be suppressed).

Paredes's admissible statements gave the HPD Officers probable cause to believe that Paredes's car contained a shotgun and ammunition, thus allowing the police to search the car without a warrant pursuant to the "automobile exception" to the warrant requirement. The Officers discovered the shotgun, ammunition, and drugs while conducting this search; consequently, the Fourth Amendment does not require suppression of the items recovered from the car. As for Paredes's post-search statements, Paredes's only argument for suppression of these statements is that the statements are tainted by an unlawful custodial interrogation and search (pursuant to *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).[8] Because the court finds that the pre-search statements are admissible and the search was lawful, the court finds that the post-search statements are likewise admissible.

---

8. Paredes does not argue that his post-search *Miranda* waivers were somehow inadequate.

The admissibility of each of these three categories of items is addressed in turn.

### A. Paredes's Pre–Search Statements

#### 1. Paredes's statement to Officer Oliver at the scene of the accident is admissible

Paredes's motion to suppress did not ask the court to suppress Paredes's initial statement to Officer Oliver regarding the shotgun and ammunition because, prior to the hearing on August 1, 2005, neither the prosecutor nor the defendant knew about this first statement.[9] Nevertheless, the court will review Paredes's first statement to Officer Oliver—that Paredes had a registered shotgun in the trunk of his car and that he had ammunition in the car separate from the shotgun—to determine whether the Fifth Amendment requires its suppression.[10] The court concludes that this statement need not be suppressed.

In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court established the rule that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimina-

tion." The Supreme Court reasoned that the privilege against self-incrimination is protected by adequately and effectively advising an individual of his or her rights. *Id.* at 467, 86 S.Ct. 1602. The Supreme Court also stated, however, that "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Id.* at 478, 86 S.Ct. 1602.

Fourteen years later, in *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court explained that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are *reasonably likely to elicit an incriminating response* from the suspect." (Emphasis added.) (Footnote omitted.) The government bears the burden of proving, by a preponderance of the evidence, that Paredes's statement was given voluntarily. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

At the time of Paredes's on-the-scene statement to Officer Oliver, Paredes had not been given any *Miranda* warn-

---

9. When Officer Oliver testified on August 1, 2005, he did not mention Paredes's on-the-scene statement. After Officer Oliver testified, government counsel informed the court and the defense that the government had learned of this statement only *after* Officers Oliver and Kobayashi had finished their testimony on that day. As a result, the court offered Paredes the opportunity to have Officers Oliver and Kobayashi recalled; both were recalled on August 3, 2005. Officer Oliver testified that he did not inform any officer at the scene about Paredes's on-the-scene statement (and did not include this information in his reports) because of the stress of being threatened with a knife and because of his inexperience as a police officer at the time of the incident.

The court has carefully weighed the testimony of Officer Oliver and finds that he was credible. Officer Oliver's demeanor appeared to the court as earnest and straightforward. Further, his testimony was consistent with other officers with respect to important details. The court finds that Officer Oliver's failure to testify to the on-the-scene statement in his initial appearance on August 1, 2005 does not detract from his credibility.

10. Paredes was given a full opportunity to cross-examine Officers Oliver and Kobayashi regarding this statement and to argue for its suppression at the conclusion of all the testimony.

ings. Assuming *arguendo* that Paredes was "in custody" at the time, the statement was not made in response to interrogation. Instead, Paredes volunteered the information about the shotgun and ammunition to Officer Oliver without being questioned by law enforcement personnel. Officer Oliver testified that he did not ask Paredes any questions, and there is nothing in the record to indicate that Officer Oliver (or any other law enforcement officer) took any action reasonably likely to elicit an incriminating response from Paredes. Officer Oliver testified that he sat and talked with Paredes to try to calm him down, but that Paredes continued to talk to himself and did not appear to respond to Officer Oliver's efforts. Because Paredes's statement about the shotgun and ammunition was volunteered to Officer Oliver, and was not made in response to "custodial interrogation," the Fifth Amendment does not require suppression of this statement.

### 2. Paredes's initial statement to Officer Espinueva at Queen's Medical Center is admissible

█ Paredes argues that his statement to Officer Espinueva at Queen's—"I get one gun in the car, not loaded, but it's a shotgun, HK Benelli, I bought from Young Guns about one month ago"—is inadmissible because the police failed to advise him of his *Miranda* rights prior to his making this statement. The court disagrees.

█ When Paredes made this presearch statement to Officer Espinueva at Queen's, he was "in custody." *See United States v. Kim,* 292 F.3d 969, 973 (9th Cir. 2002) ("To determine whether an individu-al was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide 'whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" (Quoting *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994).) (Alteration in original.)). Although Paredes had not yet been arrested, he was not free to leave; Officers Espinueva and Remington testified that they stayed with Paredes at Queen's to ensure that Paredes did not leave before the psychiatric evaluation.

Nevertheless, Officer Espinueva's response to Paredes's second request to make a statement—something to the effect of "What's up?"—does not constitute "custodial interrogation." While at Queen's, Paredes seemed intent on communicating something to Officer Espinueva. When Officer Espinueva responded, he did not know what Paredes wanted to say: Paredes could have needed to use the bathroom, or could have needed some medication, or could have wanted any number of things other than to offer incriminating statements.[11] "[S]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Innis,* 446 U.S. at 301–02, 100 S.Ct. 1682. Further, "it is relevant, but not determinative, that a question posed was not related to the crime or the suspect's participation in it." *United States v. Foster,* 227 F.3d 1096,

---

11. Officer Espinueva credibly testified that when he asked "Okay, what's up?" he had no expectation that Paredes would make an incriminating statement. "We use an objective test to determine whether questioning constitutes interrogation. Although the officer's subjective intent is relevant, it is not decisive, because in determining whether interrogation occurred, the focus is upon the defendant's perceptions." *United States v. Moreno–Flores,* 33 F.3d 1164, 1169 (9th Cir.1994) (Citations omitted).

1103 (9th Cir.2000) (Citation and internal quotation signals omitted). There is no evidence to suggest that Officer Espinueva should have known that his simple "Okay, what's up?" would have elicited an incriminating response. Consequently, Paredes's initial statement to Officer Espinueva at Queen's—"I get one gun in the car, not loaded, but it's a shotgun, HK Benelli, I bought from Young Guns about one month ago"—is admissible.

### 3. Paredes's responses to Officer Espinueva's questions regarding the location of the shotgun in his car need not be suppressed, but Paredes's statements regarding his intent in conveying that information will be suppressed

■ Without giving Paredes a *Miranda* warning, and while Paredes was in custody, Officer Espinueva specifically asked Paredes to identify the exact location of the shotgun and to indicate whether the shotgun was loaded. Paredes argues that the statements he made to Officer Espinueva in response to Officer Espinueva's questions should also be suppressed.

Paredes's statements regarding the location of the shotgun and ammunition are admissible pursuant to the "public safety exception" to *Miranda* outlined in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). In *Quarles*, the police apprehended and handcuffed an individual who was wearing an empty shoulder holster and who, moments before, was seen carrying a gun. *Id.* at 652, 104 S.Ct. 2626. Before the officers read the suspect his *Miranda* rights, they asked him where the gun was; the suspect stated that "the gun is over there" and nodded in the direction of some empty cartons. *Id.* The police officers retrieved a loaded gun from one of the cartons, formally placed the suspect under arrest, and read him his *Miranda* rights. *Id.* The Supreme Court concluded that the lower courts erred in

suppressing the defendant's statement as to the whereabouts of the gun; the Court held that "there is a 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved." *Id.* at 655–56, 104 S.Ct. 2626. The Court further explained that "the doctrinal underpinnings of *Miranda*" did not require strict adherence to *Miranda's* procedural requirements in situations "in which police officers ask questions reasonably prompted by a concern for the public safety." *Id.* at 656, 104 S.Ct. 2626. *See also United States v. Martinez*, 406 F.3d 1160, 1165 (9th Cir.2005) (stating that the public safety exception to *Miranda* "allows officers, when reasonably prompted by a concern for the public safety, to engage in limited questioning of suspects about weapons in potentially volatile situations").

■ "In order for the public safety exception to apply, there must have been 'an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon.'" *Id.* (quoting *Quarles*, 467 U.S. at 659 n. 8, 104 S.Ct. 2626) (Alteration in original). A firearm, even when locked in a vehicle's trunk, has been recognized to pose a threat to public safety. *See Cady v. Dombrowski*, 413 U.S. 433, 447, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) ("[T]he justification [for the intrusion into the vehicle] was . . . immediate and constitutionally reasonable . . .: concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle."); *United States v. Newbourn*, 600 F.2d 452, 455 (4th Cir.1979) ("Unless secured, [guns contained in the locked trunk of a car] might fall into the hands of the arrested men, or vandals, or

thieves. Thus they posed potential danger both to law enforcement officials and to members of the general public.").

In this case, Officer Espinueva had an objectively reasonable need to question Paredes regarding the location of the shotgun and ammunition. Although Oahu Towing is a "secure" facility with a fence and round-the-clock security, it is a private company; in other words, the tow yard is neither staffed nor guarded by law enforcement officials. The employees of Oahu Towing had access to the keys to Paredes's car, and could have either opened the car at will or released the car to Paredes's designee. There was a possibility that Paredes's shotgun and ammunition would be discovered and stolen.[12] In order to protect the public, Officer Espinueva sought to confirm whether the shotgun was loaded. Such a question demonstrates an objectively reasonable need to protect the public from an immediate danger associated with a shotgun in a vehicle. The public safety exception outlined in *Quarles* applies to this type of situation; the Fifth Amendment does not require suppression of Paredes's answers to Officer Espinueva's questions regarding the location of the shotgun and ammunition.

■ Paredes's responses to Officer Espinueva's final two questions, however, will be suppressed. After learning the location of the shotgun and the ammunition, Officer Espinueva asked Paredes why he wanted to turn in the shotgun, and Paredes replied, "So nobody use 'em.'" Officer Espinueva asked Paredes if he meant "for safekeeping," and Paredes nodded his head so as to indicate "yes." There was no objectively reasonable need to ask Paredes these questions, as Paredes's motivation for informing Officer Espinueva of the shotgun was irrelevant for the purpose of

protecting the police or the public from any immediate danger associated with the shotgun. Therefore, Paredes's answers to these two questions will be suppressed.

### B. Search Of Paredes's Automobile

#### 1. The items obtained from Paredes's car are admissible because the "automobile exception" permits warrantless searches where the police have probable cause to believe that the automobile contains contraband or evidence of a crime

■ "The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (Quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). Where there has been a warrantless seizure, the government bears the burden of proving that an established exception to the warrant requirement applies to justify the seizure. *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir.2001).

■ One such exception—the "automobile exception"—allows for a warrantless search of an automobile so long as "there is probable cause to believe that the car contains articles that the officers are entitled to seize." *Chambers v. Maroney*, 399 U.S. 42, 48, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). *See also Maryland v. Dyson*, 527 U.S. 465, 466, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999) (*per curiam*) ("The Fourth

---

12. This case is thus distinguishable from *United States v. Raborn*, 872 F.2d 589 (5th Cir. 1989), in which the court found *Quarles* inapplicable because the questioning related to a truck that was solely in police custody.

Amendment generally requires police to secure a warrant before conducting a search. As we recognized nearly 75 years ago ..., there is an exception to this requirement for searches of vehicles." (Citations omitted.)); *Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996) (*per curiam*) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more.").

As the Ninth Circuit explained in *United States v. Hatley,* 15 F.3d 856, 858 (9th Cir.1994), there are two basic principles underlying the automobile exception: "First, automobiles are mobile and can be moved quickly outside the jurisdiction of the magistrate from whom the warrant must be sought. Second, the expectation of privacy in one's vehicle is reduced by the pervasive regulations governing vehicles capable of traveling upon public roads." (Citations and internal quotation signals omitted.)

■■■ Paredes argues that the automobile exception does not apply because his car had been impounded and was therefore no longer "readily mobile." In support of this argument, Paredes points to the following passage from *Maryland v. Dyson,* 527 U.S. at 467, 119 S.Ct. 2013: "[T]he automobile exception does not have a separate exigency requirement: *'If a car is readily mobile* and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the vehicle without more.'" (Quoting *Pennsylvania v. Labron,* 518 U.S. at 940, 116 S.Ct. 2485). (Ellipsis in original.) (Emphasis added.) Paredes misinterprets *Maryland v. Dyson.* As the Supreme Court has stated, "[T]he justification to conduct such a warrantless search does not vanish once the car has been immobilized[.]" *Michigan v. Thomas,* 458 U.S. 259, 261, 102 S.Ct. 3079, 73 L.Ed.2d 750

(1982). *See also Cady v. Dombrowski,* 413 U.S. 433, 441–42, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) ("Although the original justification advanced for treating automobiles differently from houses ... was the vagrant and mobile nature of the former, warrantless searches of vehicles by state officers have been sustained in cases in which the possibilities of the vehicle's being removed or evidence in it destroyed were remote, if not nonexistent." (Citations omitted.)); *United States v. Garcia,* 205 F.3d 1182, 1188 (9th Cir.2000) ("[T]he search of the vehicle was valid, despite the fact that it was not completed until after the vehicle was impounded." (Citing *Michigan v. Thomas.*)). As these cases make clear, even after Paredes's car had been towed to a private garage, the automobile exception still permitted law enforcement personnel to conduct a warrantless search—provided that the officers had probable cause to conduct the search.

Paredes argues that the delay between the time that Paredes's vehicle was seized by the police and the time that it was searched by the police—which, according to Paredes was between three and seven hours—rendered the warrantless search unreasonable. This argument is similarly without merit. The Supreme Court has repeatedly held that, where the police have probable cause to search a vehicle, "the police could search later whenever they could have searched earlier, had they so chosen." *California v. Acevedo,* 500 U.S. 565, 570, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991); *United States v. Johns,* 469 U.S. 478, 484, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985) ("There is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure."). *See also United States v. Gastiaburo,* 16 F.3d 582, 587 (4th Cir.1994) ("Not a single published federal case speaks of a 'temporal limit' to the automobile exception. The Supreme Court has repeatedly stated that

a warrantless search of a car (1) need not occur contemporaneously with the car's lawful seizure and (2) need not be justified by the existence of exigent circumstances that might have made it impractical to secure a warrant prior to the search."). In *Gastiaburo,* the Fourth Circuit held that a delay of thirty-eight days between the time the automobile was seized and the time it was searched was reasonable, given that the police conducted the warrantless search of the automobile on the same day they had probable cause to believe that the automobile contained contraband. *Id.* at 586–87. Similarly, in *United States v. Casares–Cardenas,* 14 F.3d 1283, 1285–87 (8th Cir.1994), the Eighth Circuit held that a warrantless search of an automobile, spurred by a tip from a prison inmate regarding the existence of drugs in a hidden compartment in the car two months after the car was initially seized, was valid because the driver of the car had consented to the initial search two months prior. A delay of a few hours between the time Paredes's car was seized and the time the car was searched did not violate Paredes's Fourth Amendment rights.

Based on the foregoing, the court concludes that the automobile exception permitted Officers Espinueva and Kobayashi to search Paredes's car without a search warrant, provided that the government had probable cause to believe that Paredes's car contained contraband or evidence of a crime.

### 2. HPD had probable cause to believe that Paredes's automobile contained evidence of a crime

Paredes argues that HPD did not have probable cause to search his car because the transportation of a shotgun and ammunition in an automobile is not *per se* unlawful under Hawaii's "Place to Keep" law, HRS § 134–6(c). *See, e.g., United States v. Ubiles,* 224 F.3d 213 (3d Cir.2000) (concluding that the police did not have reason-

able suspicion to conduct an investigatory stop of an individual carrying a gun at a festival in the Virgin Islands because carrying a gun, standing alone, was legal in the Virgin Islands). The court agrees that the action is not *per se* unlawful, but nevertheless agrees with the government that HPD had probable cause to search Paredes's car based on the totality of the circumstances in this case.

■ Probable cause exists to search a vehicle "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found[.]" *Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Probable cause is evaluated in light of the totality of the circumstances. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "The scope of a warrantless search based on probable cause is no narrower—and no broader—than the scope of a search authorized by a warrant supported by probable cause. Only the prior approval of the magistrate is waived; the search otherwise is as the magistrate could authorize." *United States v. Ross,* 456 U.S. 798, 823, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

■ In the instant case, Officer Espinueva testified that he believed Paredes had violated Hawaii's "Place to Keep" statute by transporting the shotgun in his car. That statute, HRS § 134–6(c), provides that firearms "shall be confined to the possessor's place of business, residence, or sojourn" and may only be transported to or from "the place of purchase[;] ... a place of repair; a target range; a licensed dealer's place of business; an organized, scheduled firearms show or exhibit; a place of formal hunter or firearm use training or instruction; or a police station."

Although Paredes is correct that the mere fact that he had a shotgun and ammunition in his car does not, without more, demonstrate that he was violating HRS § 134–6(c), Paredes asks the court to elevate the standard required for a showing of probable cause. To demonstrate probable cause, the government need not *guarantee* that a search will yield evidence of a crime; instead, "probable cause" requires only that there be a *fair probability* that the search will yield such results. *See, e.g., Gasho v. United States,* 39 F.3d 1420, 1428 (9th Cir.1994) ("Probable cause exists when, under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a *fair probability* that a crime was committed. Because probable cause must be evaluated from the perspective of prudent men, not legal technicians, an officer need not have probable cause for every element of the offense." (Citations and internal quotation signals omitted.) (Emphasis added.)).[13] Thus, the mere possibility that Paredes was engaged in lawful conduct does not defeat a showing of probable cause. *See, e.g., United States v. Brady,* 819 F.2d 884, 889 (9th Cir.1987) (upholding warrantless search of an automobile for a firearm even though the police were not certain that the defendant had broken any law in carrying the firearm).

In the instant case, examining the totality of the circumstances, the court concludes that HPD had probable cause to believe that Paredes's car—specifically, the trunk and center console—contained evidence that Paredes had violated HRS § 134–6(c).[14] Paredes was involved in an automobile accident at around 5:12 a.m. on a Friday morning; the time of the accident strongly implies that Paredes was not traveling to or from a place of purchase, a place of repair, a licensed dealer's place of business, a place of formal training or instruction, a firearms show, or a police station. In addition, Officer Espinueva testified that he did not know of any firing range in the vicinity of Diamond Head Road. Consequently, the court agrees with

**13.** As the Supreme Court explained in *Illinois v. Gates,* 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983):

> As early as *Locke v. United States,* 7 Cranch 339, 348, 3 L.Ed. 364 (1813), Chief Justice Marshall observed, in a closely related context, that "the term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation.... It imports a seizure made under circumstances which warrant suspicion." More recently, we said that "the *quanta* ... of proof" appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant. *Brinegar [v. United States,* 338 U.S. 160, 173, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)]. Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision. While an effort to fix some general, numerically precise degree of certainty corresponding to "probable cause" may not be helpful, it is clear that "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Spinelli [v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)].

(Some alterations in original and some added.)

**14.** Accordingly, the seizure of the drugs was proper because the drugs were in plain view when HPD searched the center console of Paredes's car. *Horton v. California,* 496 U.S. 128, 135, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) ("An example of the applicability of the 'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character. Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate." (Citations and internal quotation signals omitted.)).

the government that HPD had probable cause to believe that Paredes's car contained evidence that he had violated HRS § 134–6(c).[15] The court also finds that either one of Paredes's initial statements about the shotgun and ammunition (*i.e.,* the statement made at the scene to Officer Oliver or the statement made at Queen's to Officer Espinueva) provided HPD with probable cause. Furthermore, the court concludes that HPD did not exceed the allowable scope of the warrantless search, as the shotgun, ammunition, and drugs were all discovered in the trunk and center console of Paredes's car.[16] *Ross,* 456 U.S. at 824–25, 102 S.Ct. 2157.

Paredes presents an alternative argument as to why HPD lacked probable cause to search his car: he contends that, because Paredes was mentally unstable (both at the scene of the accident and at Queen's), his statements to Officers Espinueva and Oliver should have been disregarded as unreliable. This argument is similarly without merit. Although several HPD Officers raised doubts about Paredes's mental stability in the hours after the automobile accident, the Officers believed that Paredes was calm and coherent when making these statements. The fact that Paredes was making a statement incriminating himself in criminal conduct strongly suggests that his statements were reliable. Further, there was nothing

inherent in the nature of Paredes's statements to suggest that they were unreliable. The opposite is true—they were admissions of criminal activity and therefore bore sufficient indicia of reliability. *United States v. Harris,* 403 U.S. 573, 583, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971) ("Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search."); *United States v. Patayan Soriano,* 361 F.3d 494, 505 (9th Cir.2004) ("[S]tatements [that] amounted to admissions of criminal activity ... could be deemed reliable on that basis."). Based on the totality of the circumstances, the police had probable cause to believe that they would find a shotgun and ammunition in the trunk and center console of Paredes's car.

**3. Alternatively, the search of Paredes's car was proper according to *Cady v. Dombrowski***

■■ Even if HPD did not have probable cause to believe that Paredes had violated HRS § 134–6(c), the police were nevertheless entitled to search Paredes's car to protect the public safety. In *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), the Supreme Court upheld a warrantless search of an automobile under circumstances similar to those

---

15. The court specifically finds that Paredes's statements at the scene of the accident and at Queen's were not coerced; consequently, even if the court were to suppress all of Paredes's pre-search statements, the evidence recovered from Paredes's car would be admissible because "[i]ntroduction of the non-testimonial fruit of a voluntary statement ... does not implicate the Self–Incrimination Clause." *United States v. Patane,* 542 U.S. 630, ——, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004). The admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial.

16. In his statement to Officer Oliver, Paredes said that he had a shotgun in the trunk and ammunition that was separate from the shotgun. This statement, standing alone, would have given HPD probable cause to search the trunk and any other area of the car that could have contained the ammunition. *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). Therefore, in searching the trunk and center console of Paredes's car, the Officers did not exceed the allowable scope of the warrantless search.

in the instant case. In that case, Dombrowski, a police officer from Chicago, was involved in an automobile accident in Wisconsin and was subsequently arrested for drunken driving. *Id.* at 435–36, 93 S.Ct. 2523. The police in Wisconsin believed that Chicago police officers were required to carry their service revolvers with them at all times, but Dombrowski did not have his revolver on his person when the police arrived at the scene of the accident. *Id.* at 436, 93 S.Ct. 2523. The police checked the front seat and glove compartment of Dombrowski's car but did not find the revolver. The police had the car then towed to an unguarded private garage (located seven miles from the police station). *Id.* A Wisconsin police officer, pursuant to standard policy, went to the garage to search the car for the revolver. *Id.* at 436–37, 93 S.Ct. 2523. While searching the trunk for the revolver, the officer discovered clothing and other items that were covered in blood. *Id.* at 437, 93 S.Ct. 2523.

The Supreme Court held that the police officer's warrantless search—which was justified by the police department's "concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle"—was "constitutionally reasonable." *Id.* at 447, 93 S.Ct. 2523. The officers' reasonable belief that the trunk of Dombrowski's car contained a revolver, coupled with the officers' fear that someone might break into Dombrowski's car and steal the revolver, justified the warrantless search. *Id.* at 448, 93 S.Ct. 2523. The Court rejected the argument that the search was unreasonable because the police could have guarded Dombrowski's car to prevent the theft of the revolver: "The fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." *Id.* at 447, 93 S.Ct. 2523. *See also United States v. Feldman,* 788 F.2d 544, 552 n. 10 (9th

Cir.1986) ("The public safety concern which we recognize here to uphold the search of [the defendant's] rental car, like that in *Quarles, Cady* and [*United States v. Prescott,* 599 F.2d 103 (5th Cir.1979)], relates only to an officer's reasonable belief that the vehicle (or supermarket in *Quarles'* case) contained a gun which ought to be secured immediately."); 3 W.LaFave, *Search and Seizure* § 7.4(c), at 660–62 (4th ed.2004) (discussing *Cady* ).

In the instant case, in order to protect the public safety, the police were entitled to search the trunk and center console of Paredes's car for a shotgun and ammunition. Because the police discovered the shotgun, ammunition, and drugs while searching the trunk and center console of Paredes's car, the search clearly did not exceed the scope of a permissible *Cady* search. *See* 3 W.LaFave, *Search and Seizure* § 7.4(c), at 662 (4th ed. 2004) ("Assuming a lawful *Cady* search, it may extend only to those places in the vehicle where a gun might be located and may continue only so long as is necessary to discover the gun or guns believed to be therein."). Consequently, even if the court were to conclude that HPD did not have probable cause to believe that Paredes's car contained evidence of a violation of HRS § 134–6(c), the Officers' warrantless search was nevertheless valid under *Cady.* In sum, there is no basis upon which to suppress evidence obtained as a result of that search.

### 4. The issue of Paredes's capacity to consent is moot

 Paredes contends that he did not have the capacity to consent based on his mental infirmity, evidenced by the fact that he was admitted to Queen's Medical Center for a psychiatric evaluation shortly after giving his consent. As discussed *supra,* HPD was entitled to search Paredes's

car pursuant to the automobile exception or the public safety exception. Therefore, the court need not and does not address the validity of Paredes's consent.

## C. *Paredes's Post–Search Statements*

Paredes argues that his post-search statements to state and federal law enforcement officers should be suppressed as "tainted" evidence derived from an unlawful search. *See Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). As discussed *supra,* however, the search was valid; consequently, there is no "tainted" evidence warranting suppression.

### III. *CONCLUSION*

For the reasons stated above, Paredes's motion to suppress is GRANTED in part and DENIED in part.

IT IS SO ORDERED.